IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 4, 2003

## IN RE: D. D. K., D. M. M., and T. J. M., JR.

**Appeal from the Juvenile Court for Montgomery County**
**No. 64-169      L. Raymond Grimes, Judge**

---

### No. M2003-01016-COA-R3-PT - Filed December 30, 2003

---

This appeal involves a petition filed by the Department of Children's Services to terminate the parental rights of Father to his two minor children. The trial court granted the petition and Father appeals the decision. Because we find the petition was improperly granted, we vacate and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Vacated and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Adrian R. Bohnenberger, Clarksville, Tennessee, for the appellant, T. J. M., Sr.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

At issue is the trial court's granting the petition to terminate the parental rights of Father in regard to his two (2) minor children, D.M.M., a son born October 7, 1989, and T.J.M., Jr., a son born January 6, 1992.[1]

On September 4, 1998, the Department of Children Services ("DCS") petitioned the Montgomery County juvenile court for temporary custody of six-year old T.J.M., Jr. and his older brother, nine year old D.M.M. The petition alleged that the children's mother, T.W., was using crack cocaine on a regular basis and was not providing adequate care to the children. The petition identified Father by name and stated his address was unknown. By order entered the same day, the

---

[1]At the trial level, the case also involved termination of the parental rights of a third child of Mother, D.D.K. That child had a different father, and issues regarding termination of parental rights to D.D.K. are not involved in this appeal by Father.

juvenile judge found probable cause that the children were dependent and neglected and placed them in DCS custody. After working with Mother for a year, DCS determined that the children were "ready to return home," and a trial home visit was attempted in November, 1999. However, Mother subsequently tested positive for cocaine, and on January 4, 2000, the children were again removed from the home, placed briefly in foster care, and then placed with their maternal aunt G.W.

At the time of the removals, the children were living with Mother. Father spent a great deal of time at the apartment, but denies he was living there. He testified he had daily visited or checked on the children during the trial period when the children were returned to their mother's custody. He was aware DCS removed the children.

Father testified he went to the DCS office two days after the removal. He testified he was not given any paperwork to fill out and was not told to call or return to the DCS office. He never made another attempt to contact DCS about his children. He also testified he once telephoned the maternal aunt with whom the children were living. He testified she told him he was not allowed to visit the children or come around them. He did not make any effort to see or contact the children because he did not want to cause any trouble. He saw the children at a family funeral but did not visit with them because, he testified, he did not want to cause any problems.

During this time, Father lived in a shed behind his parents' house. His mailing address was his parents' house, and he received mail there. He stated he had told DCS his address when the children were removed. The children's caseworker testified the children knew where Father lived and gave her general directions to the place. She also testified she looked for the parents' house and found it once. She did not testify that she tried to go in or that she talked, or tried to talk, to Father or his parents at that time.

Father testified he wanted the children to live with him, but it was his understanding he could not get his children back because he did not have a suitable place for them to live. As of the date of trial, he still did not have suitable housing, but testified he knew that it would be necessary to have a suitable place to live in order to get the children. He also testified, however, that a representative of the Department of Human Services had told him only six months earlier that he would have to establish a suitable residence and he had then filed applications for government subsidized housing and was on two waiting lists.

Apparently, Father had been under a prior order to pay child support to Mother. In January of 2001, a year after the children were returned to DCS custody, a new support order was entered. The Assistant District Attorney in charge of child support enforcement in the county testified that an order was entered by default because Father did not appear at the hearing. Consequently, child support was set using a presumptive salary of $25,761 according to the child support guidelines. Regular payments had been made more or less weekly since July of 2001 by Father's employer

pursuant to a wage assignment.[2]  The amount paid was less than the amount ordered.  Father was employed by the City of Clarksville in its recreation department.  Nothing in the record indicates how long he had been so employed.  He was not asked if his job was full time or part time, as had been indicated through hearsay testimony earlier in the trial, or how much money he earned.  The Assistant D.A. testified his office would have provided DCS information on Father's place of employment if DCS had asked for it.  Father testified he could receive telephone calls at work.  DCS never attempted to contact him there and never asked the child support office for information about Father.[3]

## II.

DCS filed a petition to terminate the parental rights of Mother and Father on February 20, 2002.  The petition alleged Father had abandoned the children by not visiting and not paying support for the four months immediately preceding the petition.  An affidavit accompanied the petition in which Ms. Hall, the DCS caseworker, testified regarding her unsuccessful attempts to locate Mother, concluding Mother's whereabouts were unknown and could not be ascertained.  No such affidavit regarding Father accompanied the petition.  Indeed, Father appeared at the hearing on the petition held May 23, 2002, and requested appointment of counsel.  The hearing was continued as to Father's parental rights and an attorney was appointed for him.[4]  The hearing on the petition to terminate Father's rights was held October 17, 2002.  The only order in the record before us, entitled Final Decree of Guardianship, that appears to grant termination of Father's parental rights was entered March 25, 2003, stating it was entered *nunc pro tunc*, but failing to state the date it should have been entered.  The order begins with a recital that the matter "came on to be heard October 17, 2002."[5]  The order terminated Father's parental rights on the ground of abandonment, Tenn. Code Ann. § 36-1-113(g)(1), based on his failure to visit, and a finding that such termination is in the best interests of the children.

## III.

A parent has a fundamental right to the care, custody and control of his or her child.  *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994).  This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest.

---

[2]This testimony contradicted the testimony of the DCS caseworker and the allegations in the petition.

[3]The caseworker called that office in preparation for the termination proceeding.

[4]Mother's rights were terminated after this hearing by order dated July 8, 2002.  Mother's termination is not at issue in this appeal.

[5]Meanwhile, on November 4, 2002, DCS prepared a new permanency plan for the children with the goal of adoption.

*Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, "severing forever all legal rights and obligations of the parent." Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996) (quoting *Santosky,* 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting)). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.* The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). This most drastic interference with a parent's rights requires "the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Our legislature has established those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought, Tenn. Code Ann. § 36-1-113(g), and parental rights may be terminated only in those statutorily defined circumstances. *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Because the decision to terminate parental rights affects fundamental constitutional rights, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403; *In re M.W.A.*, 980 S.W.2d at 622; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

The existence of any one statutory ground will support termination of an individual's parental rights. *In re C.W.W.*, 37 S.W.3d at 473. In addition, if a court, applying the appropriate evidentiary standard, determines that one of the grounds exists, the court must also find, using the clear and convincing evidence standard, that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). However, a best interests analysis is not warranted unless grounds have been proved.

The sole ground alleged as the basis for the termination of Father's parental rights was abandonment, as set out in Tenn. Code Ann. § 36-1-113(g)(l), which incorporates the definition found in Tenn. Code Ann. § 36-1-102(1)(A)(I). Under that statute, abandonment is the willful failure to visit, to support, or to make reasonable payments for support for a period of four consecutive months immediately preceding the filing of the petition. When using that ground, DCS is required by statute to provide notice to the parent of the conduct that will constitute abandonment,

4

as a prerequisite to termination on that ground. We begin our analysis of this case with those requirements.

IV.

Even after a child had been validly committed to the custody of DCS, the State's first priority is to restore the family unit if at all possible. *In the Matter D.D.V.* , No. M2001-02282-COA-R3-JV, 2002 WL 225891, *8 (Tenn. Ct. App. Feb. 14, 2002) (no Tenn. R. App. 11 application filed). Additionally, for any child placed in foster care, DCS must prepare a permanency plan within thirty days of that placement. Tenn. Code Ann. § 37-2-403(a)(1). A permanency plan is a written plan for a child placed in foster care. The plan sets out requirements for the achievement of a specific goal, such as reunification of the family, adoption, or permanent foster care. Tenn. Code Ann. §§ 37-2-402(8) & -403(a)(1). Tenn. Code Ann. § 37-2-403(a)(2)(A) mandates that the requirements of the permanency plan be stated in specific terms and be reasonably related to the specific goal. The permanency plans are to be reviewed within a specified time after foster care placement and no less often than every six (6) months thereafter, to assess compliance with the requirements and project a likely date on which the goal of the plan will be achieved. Tenn. Code Ann. § 37-2-404(b).

Parents are usually involved in the development and review of permanency plans. Through that process the parent is informed of the steps he or she must take to have the child returned and to avoid termination of parental rights. In particular, the legislature has determined that the ground of abandonment must be explained to the parents. To that end, Tenn. Code Ann. § 37-2-403 provides in pertinent part:

> (a)(2)(A) The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified in subdivision (a)(1). **The statement shall include the definitions of "abandonment" . . . contained in § 36-1-102 and the criteria and procedures for termination of parental rights.** Each party shall sign the statement and be given a copy of it. The court must review the proposed plan within sixty (60) days of the foster care placement. . . .

> (B)(i) The parents or legal guardians of the child shall receive notice to appear at the court review of the permanency plan or the plan of care and **the court shall explain on the record the law relating to abandonment contained in § 36-1-102, and shall explain that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child,**. . . . If the parents or legal guardians are not at the hearing to review the permanency plan or plan of care, the court shall explain to the parents or guardians at any subsequent hearing regarding the child held thereafter, that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child, . . . .

5

(ii) If the parents or guardians of the child cannot be given notice to appear at the court review of the permanency plan or plan of care, or if they refuse or fail to appear at the court review of the permanency plan or plan of care, or cannot be found to provide notice for the court review of the permanency plan or plan of care, any agency which holds custody of the child in foster care or in any other type of care and **which seeks to terminate parental or guardian rights based upon abandonment of that child under § 36-1-102**, **shall not be precluded from proceeding with the termination based upon the grounds of abandonment**, **if** the agency demonstrates at the time of the termination proceeding:

>   (*a*) That the court record shows, or the petitioning party presents to the court a copy of the permanency plan or plan of care that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(I), has signed the portion of the permanency plan or plan of care which describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made the statements to the parents or legal guardians required by subdivision (a)(2)(B)(I).

>   (*b*) By an affidavit, that the child's permanency plan or plan of care containing language which describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan which describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians.

>   (*c*) That if the court record does not contain a signed copy of the permanency plan or plan of care, or if the petitioning agency cannot present evidence of a permanency plan or plan of care showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and, in this circumstance, if there is no other court record of the explanation by the court of the consequences of abandonment and the right to seek an attorney at any time, then **the petitioning agency shall file with the court an affidavit in the termination proceeding which describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(I) to such parent or guardian at any time prior to filing the agency's filing**

**of the termination petition**.).

§ 37-2-403 (emphasis added).

Thus, DCS was not authorized to proceed on the ground of abandonment unless it could show (1) Father was given the required notice by a permanency plan containing the notice and signed by Father or that Father refused to sign such a plan presented to him, (2) in the absence of those documents, some court record showing an explanation by the court of the consequences of abandonment, or (3) an affidavit of diligent efforts by DCS to provide such notice prior to the filing of the termination petition. Our review of the record before us contains none of these alternative methods of showing notice.

There are no pre-petition permanency plans in the record. There was no testimony DCS attempted to present a plan to Father. The record does contain Quarterly Progress Reports of Children in State Custody and Judicial Review Summaries of various dates during the children's placement in state custody. They are all related to Mother's obligations under a permanency plan she apparently agreed to. We have carefully reviewed each of these documents and find no indication Father was ever included in any permanency planning or judicial review. Nothing on the Judicial Review Summaries reflects that Father was given the required notice by the court.

In its order terminating Father's parental rights, the court specifically found that Father had appeared twice in court, "April 12, 2002, when he announced in open court that he would hire an attorney and on May 23, 2002, at the initial termination hearing when he announced that he could not hire an attorney." Nothing in this order indicates that Father was notified of the definition and consequences of abandonment in open court on these occasions. In any event, those appearances occurred after the filing of the petition to terminate on the ground of abandonment. Consequently, we must consider whether DCS complied with Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii)(*c*).

The record contains no affidavit as required by Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii) "c". In addition, the testimony at the hearing on the petition by the caseworker, Ms. Hall, indicates no affidavit complying with subsection (*c*) could have been filed.

| | |
|---|---|
| Court: | And, from September of 1998 to February the 20th, 2002, what efforts did you make to contact [T.M. Sr.]? |
| Ms. Hall: | We always sent him letters informing him of Foster Care, Permanency Plans, anything that was taking place with the Department. |
| Court: | Did any of those letters come back to you? |
| Ms. Hall: | No, sir. |
| Court: | Do you have a record here today, your file? |

*****

| | |
|---|---|
| Court: | Can you look through your file from 1998 and tell the Court what letters were forwarded or what notices were forwarded to [T.M.Sr]? |

****

Ms. Hall: The only one that can be found is on January 2002 to [T.M.Sr.]. This is the only one that can be found.

Mr. Hay: Were there Foster Care Review Boards set for these children?

Ms. Hall: Yeah. Yes. We have Foster Review letters in here, but they're all going to other people.

*****

Court: Go back to the beginning, Ms. Hall. When did you know [T.M.Sr]?

Ms. Hall: Just according to the records, there is no information on him. He never, there is no permanency plan in the file where he signed or anything.

Court: That's not the question I'm asking. He can't sign a Permanency Plan, Ms. Hall, if he doesn't know about it. When did you-all know about [T.M.Sr.]?

Ms. Hall: I learned about [T.M.Sr.] two-and-a- half years ago when I received this case.

Court: Ms. Hall, why didn't you contact or notify [T.M.Sr.] prior to January 10th, 2002?

Ms. Hall: I have contacted [T.M.Sr.] before January 2002.

****

(Brief recess taken)

Court: In reviewing your file in our short break, . . . .what notice or notices you found since the children have been in custody in '98 to [T.M. Sr.]?

Ms. Hall: Yes, sir. There was a letter sent out to [T.M. Sr] by a previous case manager in 2000 telling him that they was going to have a Judicial Review Board.

Court: Where was that sent to?

Ms. Hall: That was sent to 408 Louise Lane.[6]

Court: All right. What else, what other notice or notices do you have in there or communications to [T.M.Sr.]?

Ms. Hall: We have, the January the 10th, 2002 informing him that the Department was considering termination of paternal rights. We have one went out March 12th, 2002 informing him of a court date.

On re-cross examination, Ms. Hall had the following exchange with Father's counsel:

Attorney: Did you ever try to find out where [T.M.Sr.] was employed, where child support was coming from?

Ms. Hall: No, sir.

Attorney: And so, you never tried to contact him at his job?

Ms. Hall: No, sir. . . .

Attorney: Did you ever, did an investigative officer or anything for DCS every try to find [T.M.Sr.]?

Ms. Hall: According to my knowledge, I'm unsure right now.

---

[6]The summary states that Father's address is "Louise Avenue, Clarksville, TN." The summary is checked to indicate the parents/caregiver notified. The maternal aunt appears to have attended the review. The recommended goal was "relative placement due to mother's total non-compliance with permanency plan and pending criminal charges."

Thus, DCS sent two letters or notices to Father before filing the termination petition. Neither was made an exhibit or appears in the record before us. The witness's description of the documents does not indicate that either included the notice required by Tenn. Code Ann. § 37-2-403(a)(2)(A).

Consequently, we conclude that DCS has failed to demonstrate any of the statutory circumstances under which it could proceed to terminate Father's parental rights on the ground of abandonment.

This court has previously held that without proof in the record of compliance with the notice provisions of Tenn. Code Ann. § 37-2-403, a trial court's finding of abandonment must be set aside. *In the Matter of C.L.H. et al*, No. M2000-02799-COA-R3-JV, 2001 WL 605101, *5 (Tenn. Ct. App. June 5, 2001) (no Tenn. R. App. 11 application filed). In that case, the parents had been included in the permanency plans and both had worked with DCS in varying degrees. Nonetheless, because the plans did not include the required information and the record did not otherwise show that DCS had adequately explained the consequences of failure to visit or failure to support to the parents as required by Tenn. Code Ann. § 37-2-403, this court found the trial court had erred in finding that the parents had abandoned the children.

We do not reach the question of whether DCS was obligated to include Father in its planning of the children's future through a permanency plan. *See In the Matter of A.J.H.*, No. M2002-01568-COA-R3-JV, 2003 WL 1129817, *4 (Tenn. Ct. App. March 14, 2003) (no Tenn. R. App. 11 application filed). We also do not reach the issue primarily argued in the parties briefs, *i.e*., whether DCS used reasonable efforts or was required to use reasonable efforts to reunite Father with his children under Tenn. Code Ann. § 37-1-166.[7]

This court deals with no issue of greater importance than termination of parental rights. There is no more significant action by the State in the context of civil proceedings. We are deeply aware of the gravity of any decision we make in these cases, including the consequences to the children whose status cannot be finalized. However, we cannot ignore DCS's failure to comply with the plain statutory requirements necessary for termination on the only ground it alleged. The power and discretion granted to DCS in these situations must be exercised in strict compliance with the legal requirements established in recognition of a parent's fundamental rights.

Because the record before us does not demonstrate that Father was provided with the required notice of the definition of abandonment and the consequences of abandonment, and does not include proof of any circumstance justifying the failure to provide notice as set out in the statute, we must

---

[7]While we customarily limit our consideration to those issues raised by the parties, Tenn. R. App. P. 13(b) permits us to consider other issues in order to prevent injury to the public and prejudice to the judicial process. This case involves a fundamental right protected by our Constitution as well as statutory procedural requirements for interference with that right. Thus, it falls within the exception in Rule 13(b).

vacate the judgment of the trial court termination Father's parental rights. Our decision does not affect custody of the children. That decision is left to the trial court herein. *In re Valentine*, 79 S.W.3d at 550. Costs of this appeal are taxed to the appellee, State of Tennessee, Department of Children's Services.

_____
PATRICIA J. COTTRELL, J.